United States District Court
Southern District of Texas

**ENTERED**

February 11, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ELIZABETH ANN HERNANDEZ, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-14-3340 |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM AND ORDER DENYING PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT AND GRANTING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Before the Magistrate Judge[1] in this social security appeal is Plaintiff's Motion for Summary

Judgment and Memorandum in Support thereof (Document Nos. 12 & 13), and Defendant's Motion

for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment (Document

No.14).  After considering the cross motions for summary judgment, the administrative record, and

the applicable law, the Magistrate Judge ORDERS, for the reasons set forth below, that Defendant's

Motion for Summary Judgment (Document No. 14) is GRANTED, Plaintiff's Motion for Summary

Judgment (Document No. 12) is DENIED, and the decision of the Commissioner is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on September
21, 2015.  (Document No. 17).

**I. Introduction**

**I. Introduction**

Plaintiff, Elizabeth Ann Hernandez ("Hernandez") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. 405(g), seeking judicial review of a final decision of the Commissioner of Social Security Administration ("Commissioner") denying her application for disability benefits.  Hernandez argues that substantial evidence does not support the Administrative Law Judge's ("ALJ") decision, and the ALJ, Thomas G. Norman, committed errors of law when he found that Hernandez was not disabled.  Hernandez argues that she has been disabled since March 15, 2011.  (Tr. 138-146).  According to Hernandez, the ALJ erred in his rejection of the physical opinion of limitations from treating physician Dr. Willits and of the mental opinion of limitations from treating physician Dr. Young.  She argues that both opinions about her physical and mental limitations are consistent with the record as a whole and should have been given controlling weight. Hernandez further argues that the ALJ failed to properly evaluate her credibility.  Lastly, Hernandez contends that the ALJ relied on flawed vocational expert testimony because it was premised on the ALJ's residual functional capacity (RFC) finding that was not supported by the record.  Hernandez seeks an order reversing the ALJ's decision,  and awarding benefits, or in the alternative, remanding her claim for further consideration. The Commissioner responds that there is substantial evidence in the record to support the ALJ's decision that Hernandez was not disabled, that the decision comports with applicable law, and that the decision  should, therefore, be affirmed.

**II. Administrative Proceedings**

On November 25, 2011, Hernandez filed for disability insurance benefits claiming she has been disabled since March 15, 2011.  (138-146).  The Social Security Administration denied her application at the initial and reconsideration stages.  (Tr.75-77, 81-86). Hernandez  then requested

a hearing before an ALJ.  (Tr.  90-91).  The Social Security Administration granted her request, and the ALJ held a hearing on July 25, 2013.  (Tr.  57-74).  On  September 10, 2013, the ALJ issued his decision finding Hernandez not disabled. (Tr.21-31).

Hernandez sought review by the Appeals Council of the ALJ's adverse decision. (Tr. 15-17). The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusion; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; (4) a broad policy issue may affect the public interest or (5) there is new and material evidence and the decision is contrary to the weight of all the record evidence.  After considering Hernandez's contentions in light of the applicable regulations and evidence, the Appeals Council, on September 18, 2014, concluded that there was no basis upon which to grant Hernandez's request for review.  (Tr. 2-7).  The ALJ's findings and decision thus became final.

Hernandez has timely filed her appeal of the ALJ's decision.  The Commissioner has filed a Motion for Summary Judgment (Document No. 14).  Likewise, Plaintiff has filed a Motion for Summary Judgment (Document No.  12).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 410.  (Document No. 8).  There is no dispute as to the facts contained therein.

## III.  Standard for Review of Agency Decision

The court, in its review of a denial of disability benefits,  is only "to [determine] (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999). Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision as follows:

"[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). The Act specifically grants the district court the power to enter judgment, upon the pleadings, and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security with or without remanding the case for a rehearing" when not supported by substantial evidence. *Id.* While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute its judgment" for that of the Commissioner even if the evidence preponderates against the Commissioner's decision. *Chaparo v. Bowen*, 815 F.2d 1008, 1009 (5th Cir. 1987); *see also Jones* at 693; *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229 (1938)). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala,* 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983) (quoting *Hemphill v. Weinberger*, 483 F.2d 1127 (5th Cir. 1973)).

## IV. Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has the

burden of proving her disability. *Johnson v. Bowen*, 864 F.2d 340, 344 (5th Cir. 1988). The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The impairment must be proven through medically accepted clinical and laboratory diagnostic techniques. *Id.* § 423(d)(3). The impairment must be so severe as to limit the claimant in the following manner:

> [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work.

*Id.* § 423(d)(2)(A). The mere presence of an impairment is not enough to establish that one is suffering from a disability. Rather, a claimant is disabled only if she is "incapable of engaging in any substantial gainful activity." *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milan v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to determine disability status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe" impairment or combination of impairments, she will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents her from doing any other substantial gainful activity, taking into consideration her age, education, past work experience, and residual functional capacity, she will be found disabled.

*Id.*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558, 563 n.2 (5th Cir. 1995); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991).  Under this formula, the claimant bears the burden of proof on the first four steps of the analysis to establish that a disability exists.  If successful, the burden shifts to the Commissioner, at step five, to show that the claimant can perform other work. *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999).  Once the Commissioner demonstrates that other jobs are available, the burden shifts, again, to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.  *Leggett*, 67 F.3d at 563.

In the instant action, the ALJ determined, in his September 10, 2013, decision that Hernandez was not disabled at step five. In particular, the ALJ determined that Hernandez had not engaged in substantial gainful activity during the period from her alleged onset date of March 15, 2011, through the date last insured of September 30, 2012 (step one); that Hernandez's degenerative disc disease, hypertension, obesity, mood disorder, and bipolar disorder were severe impairments (step two); that Hernandez did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in Appendix 1 of the regulations (step three); based on the record, and the testimony of Hernandez, Hernandez had the RFC to perform sedentary work except that she "must alternate between sitting and standing at will; can understand, remember, and carry out simple instructions; make simple decisions; attend and concentrate for extended periods; interact with coworkers and supervisors; respond to changes in a routine work setting; and can have occasional public contact."  (Tr. 26).  The ALJ further found that Hernandez was unable to perform any past relevant work (step four); and that based on Hernandez's RFC, age, education, work experience, and the testimony of a vocational expert, that Hernandez could perform work as a surveillance system monitor, a ticket counter, and a check cashier, and that Hernandez was not disabled within the

meaning of the Act (step five).  As a result, the Court must determine whether substantial evidence

supports the ALJ's step five finding.

In determining whether substantial evidence supports the ALJ's decision, the court weighs

four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating,

examining and consultative physicians on subsidiary questions of fact; (3) subjective evidence as

testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's

educational background, work history, and present age.  *Wren*, 925 F.2d at 126.

## V.  Discussion

The objective medical evidence shows that Hernandez has been treated for back and neck

problems.  She underwent an involuntary hospitalization for mental health issues and since then has

been treated for a mood disorder and bipolar disorder.  She is obese and has hypertension.

The records show that Hernandez was first seen by Dr. Willits on March 11, 2011.  (Tr.

237).  She complained of neck and back pain.  Hernandez stated that she had a history of whiplash

and been doing a considerable amount of bike riding.  Dr. Willits noted that the exam was "WNL."

Otherwise, the form was blank.  At Hernandez's follow-up appointment on April 21, 2011, lab

results were reviewed.  Otherwise, the form was blank.  (Tr. 238).  Because of her complaints of

neck and back pain, Dr. Willits ordered MRI imaging of the lumbar spine and cervical spine.

On May 2, 2011, Hernandez had an MRI of the lumbar spine (Tr. 230-231, 245-246, 299-

301, 321-323) and an MRI of the cervical spine (Tr. 232-233, 243-244, 297-298, 319-320).  With

respect to the MRI of the lumbar spine, the radiologist opined as follows:

Impression

1.  Multilevel degenerative changes as described above.

2.  At L3-L4, there is asymmetric annular bulging with a posterior central annular

fissure.  There is also a right neural foramina disc protrusion mildly impinging the right L3 exiting nerve root.  There is moderate to severe central canal stenosis and moderate right neural foramina stenosis at this level

.

3.  At L4-L5, there is mild canal stenosis.

4.  At L2-L3, there is a tiny posterior central annular fissure as well as mild central canal stenosis.

5.  At T12-L1, there is a focal left paracentral disc herniation measuring 8 mm AP, which mildly flattens the left anterior aspect of the spinal cord, but without cord edema.

6.  At T11-T12, there is a focal left paracentral disc herniation measuring 5 mm AP.

7.  At T10-T11, there is a focal posterior central disc protrusion.

As for the cervical spine MRI, the radiologist opined:

1.  Multilevel degenerative changes as described above.

2.  At C6-C7, there is moderate central canal stenosis as well as moderate right and severe left neural foramina stenosis.

3.  At C5-C6, there is moderate central canal stenosis and severe bilateral neural foramina stenosis.  There are also mild type 1 end plate changes at this level.

4.  At C4-C5, there is moderate right and mild left neural foramina stenosis.

5.  At C3-C4, there is moderate right neural foramina stenosis.
Hernandez was seen by Dr. Willits on May 18, 2011.  (Tr. 239).  She sought a stronger pain medication than Tramadol, which she reported was not working.  Dr. Willits prescribed Tylenol 3.  There are no objective clinical findings.

On June 25, 2011, Hernandez was evaluated by David MacDougall, D.O. for her complaints of cervical and low back pain.  (Tr. 228-229).  She brought to the appointment an MRI scan of the cervical spine dated May 2, 2011, and of the lumbar spine taken on the same date.  The results of her examination revealed that Hernandez had a limited range of motion in the neck.  The examination of the spine revealed no tenderness in the spine; normal straight leg raising; no lumbar tenderness;

no lower back pain on palpation; normal motor strength; she was neurologically intact; and a full range of motion in all extremities.  Based on the MRIs, and his examination, Dr. MacDougall opined that Hernandez had cervical spondylosis and degenerative disc changes throughout the lumbar spine. He recommended that she undergo an anterior cervical discectomy with fusion and plating C5 through C7.  (Tr. 229).

Hernandez was next seen by Dr. Willits on June 27, 2011.  (Tr. 240).  The progress note shows that she was out of pain pills, and asked she be prescribed stronger pain medicine.  Dr. Willits wrote that Dr. MacDougall suggested surgery but  "pt refuses surgery at this time."  The form otherwise was blank of objective clinical findings.

Hernandez was seen again by Dr. Willits on October 3, 2011.  (Tr. 241).  The progress note shows that she "needs a letter stating she's disabled to give her attorney" and that she "still refuses to have back surgery."  The objective findings appear normal.

On January 11, 2012, Hernandez underwent nerve conduction-electromyography testing. (Tr. 303-307, 325-329, 386-390).  The testing was suggestive of mild to moderate right median sensory-motor neuropathy, carpal tunnel syndrome if symptomatic and suggestive of mild left median sensory neuropathy.  It was recommended that the finding be correlated with a MRI to rule out cervical compromise.  The following day, January 12, 2012, Hernandez went to see Dr. Bond at the Bay Area Consortium of Anesthesia Services for the test results.  (Tr. 302, 324, 384).  Dr. Bond wrote that the test results were not available and that Hernandez smelled strongly of alcohol. Hernandez returned for the test results on January 19, 2012.  (Tr. 308, 330, 383).  No boxes were checked indicated clinical findings.  Dr. Bond diagnosed a C6/7 broad based disc bulge complex/left foramina stenosis.  Cervical injections were recommended to treat the C6/7 broad based disc bulge.

The evidence shows that Hernandez had an appointment with Dr. Willits on January 23,

2012. (Tr. 242). There are no objective clinical findings. Dr. Willits wrote that Hernandez had "not gotten an answer as of yet from disability office. Needs paperwork filled out c/o neck, back, arms and leg problems."

Hernandez returned to the Bay Area Consortium of Anesthesia on February 13, 2012, for cervical injection at C5/6 and C6/7. (Tr. 286-296, 331-333).

Dr. Willits completed a "Physical Impairment Questionnaire" on February 23, 2012. 9Tr. 253-254). Dr. Willits described Hernandez's symptoms as neck pain, back pain, both arms and legs painful, and that her medications cause drowsiness and dizzy spells. He rated her prognosis as "fair." Dr. Willits opined that Hernandez would need to recline or lie down during a hypothetical 8-hour workday in excess of the typical 15-minute break in the morning, the 30-60 minute lunch, and the typical 15-minute break in the afternoon. In addition, Dr. Willits opined that Hernandez could not walk without rest or significant pain, could not sit, stand/walk; would need unscheduled breaks all day; could not lift any weight; was limited doing repetitive reaching, handling or fingering but could use her hands, fingers and arms 90% of the time; would be absent from work more than four times a month; and would be unable to work an 8 hour day, 5 days a week, on a sustained basis.

Hernandez underwent a consultative evaluation on March 13, 2012, with Milton Kirkwood, D.O. (Tr. 255-258). In connection with this evaluation, Dr. Kirkwood reviewed Hernandez's records including the MRIs of the cervical spine and lumbar spine and Dr. MacDoughall's report. Hernandez reported that she has "neck and back problems." (Tr. 255). Dr. Kirkwood noted she had normal gait and station. (Tr. 256). Dr. Kirkwood's clinical findings follow:

> The claimant has a good range of motion of the cervical spine although she complains of pain while doing it. She has a good range of motion of the lower spine except for flexion, which is decreased. She has tenderness to light touch in both the cervical and lumbar paravertebral muscles and she demonstrates a positive axial loading. Grip strength is normal at +5/5. Muscle tone in the upper extremities is

normal at +5/5. Muscle tone in the lower extremities is normal as well at +5/5 with good extension of the lower legs against gravity, good dorsi flexion and plantar flexion of the feet and toes against gravity as well. There is no significant atrophy appreciated in the upper extremities. In the lower extremities, the right calf measured 37 cm and the left calf measured 38 cm.

*      *      *

Cranial nerves II through XII are intact. Deep tendon reflexes are physiologic at +2/4 in the biceps and brachioradialis in the upper extremities bilaterally and +2/4 in the patellar and Achilles reflexes in the lower extremities bilaterally. Straight leg raisings are brisk and negative for radiculopathy. There were no focal neurological findings found. Sensory perception is intact in all dermatomes. Skin shows no significant rashes.

Based on his review of the medical records and his examination, Dr. Kirkwood opined:

1.   Chronic neck and back pain secondary to degenerative disc disease and hypertension.

The claimant's disability is based upon her subjective complaints of pain without objective signs of muscle weakness. She can sit, stand, and move about as well as lift, carry and handle objects. Hearing and speech is unencumbered. There is no evidence of back spasms, loss of motion or atrophy in the upper or lower extremities. Strength is normal is both the upper and lower extremities. She can walk and her gait was normal. She can tandem walk. She cannot squat or hop because of persistent pain. There is no persistent disorganization of motor function. The claimant ambulates without an assistive device. She is not describing any chest pains other than pains elicited through musculoskeletal endeavors. There are no signs of varicosities or recurrent ulcerations. (Tr. 258).

The record further shows that Hernandez was hospitalized at the University of Texas Harris County Psychiatric Center from March 16, 2012 through March 21, 2012. (Tr. 259-273). The records show that Hernandez was brought to the facility involuntarily by law enforcement. Her husband reported that she was hitting him, threatening to kill him and breaking property. (Tr. 259). When admitted, Hernandez had a GAF of 32. When she was discharged she had a GAF of 44.[2] The

---

[2] The GAF is a 100-point scale divided into ten numerical ranges, which permits clinicians to assign a single ranged score to a person's psychological, social, and occupational functioning. Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4ed. Text Revision 2000). In the most recent edition of the manual, the American Psychiatric

discharge records show that she was stable, had clear thoughts and was moderately improved.  (Tr. 272).

Hernandez underwent a back exam on March 29, 2012.  (Tr. 311, 335, 381).  Neurologically the exam results were within normal limits and she was scheduled for neck injections.  On April 9, 2012, Dr. Bond administered the injection to treat cervical spondylosis without myelopathy.  (Tr. 276-284, 337-338).  At a follow-up appointment on April 19, 2012, some limits were noted in Hernandez's range of motion.  She was neurologically intact.  The treatment note states: "resolved cervical pain."  (Tr. 313, 380).

On April 19, 2012, Kathleen A. Senior, Ph.D, evaluated Hernandez.  (Tr. 316-318).  Hernandez described her activities of daily living to Dr. Senior. Hernandez reported that she does chores, watches TV, gardens, and visits with friends.  She further reported needing no assistance with bathing and dressing.  As for social functioning, Hernandez reported marital tension, having a small friendship network and that she attends church monthly.  The results of the mental status examination reveal:

> General Appearance:  Claimant is an adult female, appearing approximately her stated age.  Hygiene and grooming were good.  Clothing was casual, clean, and appropriate.
>
> Attitude and Behavior:  She was cooperative with procedures.  Level of effort on assessment procedures was fair, with some lower persistence associated with pain complaints.  Rapport was established to an adequate degree
>
> .
>
> Mood and Affect: She reports depression, citing pain.  Depressive symptoms include recent sleep disturbance, increased appetite with estimated 10-20# gain in the past few months, and long term anger/irritability. She did not exhibit depressive signs.

---

Association dropped the GAF scale "for several reasons, including its conceptual lack of clarity (i.e, including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice."  Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 16 (5th ed. 2013).

Special Preoccupations:  She denied hallucinations or systematized delusions.  She reported long term interpersonal distrust.  She denied significant anxiety symptoms.  Stream of Mental Activity:  Mentation was of coherent form, normal content, and normal pace.

Sensorium and Orientation:  The Claimant was oriented in all spheres and to the purposes of these procedures.

Memory:   Remote memory was intact.   Recent memory (5-minute delay) for 3 attribute-object pairs was marginal, with recall of 3 attributes and 2 objects, incorrectly matched, and with low level of effort.  Immediate memory for digits was Low Average (6 forwards; 4 backwards), and this was consistent with estimated intellectual ability level (based on reported educational/vocational histories).

Concentration/Attention:  Concentration was fair, was accurate counting backwards from 20, 2 errors on months backwards (pain complaints), and with 1 error on serial subtraction of 3's from 50.

Abstraction:   Abstraction was present to a moderate degree, with adequate interpretation of 2 of 3 proverbs.  In response to Horse to Water, she said "They can show you what to do, but it's up to you to follow through."

Insight/Judgment:  Insight was adequate.  Judgment was estimated to be in the Average range and to be adequate for a variety of situations and tasks.  (Tr. 342-343)

Dr. Senior diagnosed Hernandez with alcohol dependence and mood disorder.  Dr. Senior opined that Hernandez's prognosis was guarded and could be improved with appropriate substance abuse treatment.  Hernandez had a GAF score of 60.

The records also reflect that on April 30, 2012, Hernandez had injections to treat cervical spondylosis without myelopathy.  (Tr. 340-341).

In connection with her application for disability benefits a disability determination unit physician Matthew Wong, Ph.D. completed a Psychiatric Review Technique on May 3, 2012.  With the respect to the "B" criteria of the listings, Dr. Wong opined that Hernandez has mild degree of limitation in activities of daily living and moderate degree of limitation in difficulties in maintaining social functioning and difficulties in maintaining concentration, persistence or pace.  He further

opined that Hernandez had one or two episodes of decompensation, each of extended duration. Lastly, Dr. Wong found that there was no evidence of the "C" criteria. Dr. Wong also completed a Mental Residual Functional Capacity Assessment, in which he evaluated Hernandez in four areas: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (Tr. 356-358). With respect to understanding and memory, Dr. Wong rated Hernandez as not significantly limited in the ability to remember locations and work-like procedures and the ability to understand and remember very short and simple instructions. He further found that she was markedly limited in the ability to understand and remember detailed instructions. As for sustained concentration and persistence, Dr. Wong opined that Hernandez was not significantly limited in the ability to carry out very short and simple instructions; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; and the ability to make simple work-related decisions. Dr. Wong further found Hernandez was moderately limited in the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. In one area, Dr. Wong opined that Hernandez was markedly limited in the ability to carry out detailed instructions. As for social interaction, Dr. Wong opined that Hernandez was not significantly limited in the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. He further found that she was moderately limited in the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to get along with

coworkers or peers without distracting them or exhibiting behavioral extremes.  In the area of

adaptation, that Hernandez was not significantly limited in the ability to respond appropriately to

changes in the work setting; the ability to be aware of normal hazards and take appropriate

precautions; and the ability to travel in unfamiliar places or use public transportation.  She was

moderately limited in the ability to respond appropriately to changes in the work setting; and the

ability to set realistic goals or make plans independently of others.  Based on these findings, Dr.

Wong wrote that Hernandez had following mental RFC:

> The claimant can understand, remember and carry out only simple instructions, make
> simple decisions and attend and concentrate for extended periods.  The claimant can
> interact with coworkers and respond to changes in a routine working environment.
> (Tr. 358).

Another disability determination unit physician James Wright, M.D., completed a Physical

Residual Functional Capacity Assessment on May 4, 2012.  (Tr. 360-367).  With respect to

exertional limitations, Dr. Wright opined that Hernandez could occasionally lift and/or carry 20

pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8-hour

workday; sit (with normal breaks) about 6 hours in an 8-hour workday; push and/or pull unlimited.

As for postural limitations, Hernandez could frequently climb; balance; kneel and crawl, and could

occasionally stoop.  She had no manipulative, visual, communicative and environmental limitations.

A second disability determination unit physician Robin Rosenstock, M.D. completed a Physical

Residual Functional Capacity Assessment on August 28, 2012.  (Tr. 368-375).  Based on her review

of the record, Dr. Rosenstock opined that Hernandez had no postural, manipulative, visual,

communicative, and environmental limitations.  As for exertional limitations, that Hernandez could

occasionally lift 20 pounds; frequently lift 10 pounds; stand and/or walk 6 hours; sit about 6 hours;

and unlimited push/pull.

Hernandez was seen by Dr. Bond on September 27, 2012. (Tr. 379). It has been five months since she had been seen by Dr. Bond. The progress note shows that neurologically, Hernandez was within normal limits; had not limitations in range of motion. Dr. Bond noted that he had a "long discussion with the patient. She does not want any injections. She does not think they work and she can't afford them. Will prescribe 1 month of Norco."

On March 18, 2013, Dr. Paul Young performed an initial psychiatric evaluation of Hernandez. (Tr. 407-409). Dr. Young noted that Hernandez was cooperative, had good eye contact, was alert, oriented to person, time and place; had normal speech; depressed mood, affect congruent with mood, logical thinking process, stable cognitive function, stable concentration and fair insight and judgment. Dr. Young also completed a Mental Residual Functional Capacity Assessment. (Tr. 394-396). With respect to understanding and memory, Dr. Young opined that Hernandez had moderate limitations in the ability to remember locations and work-like procedures and the ability to understand and remember detailed instructions. She had no limitations in the ability to understand and remember very short and simple instructions. As for sustained concentration & persistence, Dr. Young opined that Hernandez had no limitations in the ability to carry out very short and simple instructions. She had slight limitations in the ability to make simple work-related decisions. Hernandez had moderate limitations in the ability to work in coordination with or in proximity to others without being distracted by them; and the ability to perform at a consistent pace with a standard number and length of rest periods. She had marked limitations in the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to sustain an ordinary routine without special supervision. She had extreme limitations in the ability to complete a normal workday without interruptions from psychologically based symptoms; the ability

to complete a normal workweek without interruptions from psychologically based symptoms. As for social interaction, that Hernandez has slight limitations in the ability to ask simple questions or request assistance. She had moderate limitations in the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. She had marked limitations in the ability to interact appropriately with the general public and the ability to accept instructions and respond appropriately to criticism from supervisors. She had extreme limitations in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. As for adaptation, Hernandez had slight limitations in the ability to be aware of normal hazards and take appropriate precautions. She had moderate limitations in the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. She had marked limitations in the ability to respond appropriately to changes in the work setting.

Dr. Willits completed a Physical Residual Functional Capacity Questionnaire on June 4, 2013. (Tr. 398-399). Based on Hernandez's diagnosis of diffuse spinal degenerative disc disease with a fair prognosis, Dr. Willits opined that Hernandez could not walk without pain; could not stand or sit; and could lift no weight. Dr. Willits further opined that Hernandez could do limited reaching, handling and fingering. With her physical limitations, Dr. Willits opined that Hernandez would need to take unscheduled breaks all day and would miss work more than four times a month. Dr. Willits further stated that Hernandez was not capable of working. Dr. Willits also completed a Mental Capacity Functional Assessment. (Tr. 401-403). With respect to understanding and memory, Dr. Willits opined that Hernandez had slight limitations in the ability to understand and remember very short and simple instructions and the ability to understand and remember detailed instructions. She had moderate limitations in the ability to remember locations and work-like procedures. With

respect to sustained concentration & persistence, Hernandez had no limitations in the ability to carry out very short and simple instructions. She had moderate limitations in the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or in proximity to others without being distracted by them; and the ability to perform at a consistent pace with a standard number and length of rest periods. She had marked limitations in the ability to complete a <u>normal workday</u> without interruptions from psychologically based symptoms. (emphasis in original). She had extreme limitations in the ability to complete a <u>normal workweek</u> without interruptions from psychologically based symptoms. (emphasis in original). As for social interaction, that Hernandez had no limitations in the ability to interact appropriately with the general public; the ability to ask simple questions or request assistance; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness. She had marked limitations in the ability to accept instructions and respond appropriately to criticism from supervisors. As for adaptation, Hernandez had no limitations in the ability to respond appropriately to changes in the work setting; the ability to be aware of normal hazards and take appropriate precautions; and the ability to set realistic goals or make plans independently of others. She had slight limitations in the ability to travel in unfamiliar places or use public transportation.

The record shows that Hernandez was seen again by Dr. Young on June 16, 2013. (Tr. 406). Dr. Young noted that Hernandez had good eye contact; appeared alert, and oriented. She appeared anxious.

Hernandez completed a Function Report on or about January 17, 2012.  (Tr. 176-183).
Hernandez wrote that she in unable to work because "I have whiplash in my neck, chest and
shoulders.  I need surgery.  I have arthritis in my spine that hurts all this time.  My pain never goes
away . . . I also have high blood pressure.  I have to sleep on my side all the time."  (Tr. 176).  In
response to questions about her daily activities, Hernandez wrote that fixes breakfast for her husband
and goes back to bed for a few hours.  Occasionally, she goes to the store or a friend's house.  She
fixes dinner. (Tr. 177).  Hernandez reported that she needed no reminders to take medicine or take
care of her personal needs or assistance to dress, bathe, feed or use the toilet.  (Tr. 177-178).
Hernandez further reported that she prepares her own meals but takes breaks.  (Tr. 178).  As for
house and yard work, Hernandez wrote that she is able to clean, do laundry, mow and cook.  She
wrote:  "it may take me all day but I eventually get it done."  (Tr. 178).  Hernandez wrote that she
spends as much time as possible outside.  (Tr. 179).  She gets around by walking, riding in a car or
riding a bicycle. (Tr. 179).  Hernandez identified her hobbies as watching television, gardening and
cooking.  (Tr. 180).  As for social activities, Hernandez wrote that she watches television and talks
to neighbors.  She needs no reminders to go places and can go alone.  (Tr. 180).  Hernandez reported
that she does not handle stress well, has no problems paying attention, and can follow written and
oral directions.  (Tr. 181-182).  Hernandez described that she was limited in the ability to lift, squat,
bend, stand, reach, walk, sit, kneel, stair climb, concentrate, understand, and use hands.  (Tr. 181).

Here, substantial evidence supports the ALJ's finding that Hernandez's degenerative disc
disease, obesity, mood disorder, and bipolar disorder were severe impairments at step two, and that
such impairments at step three, individually or in combination, did not meet or equal a listed
impairment.

RFC is what an individual can still do despite her limitations.  It reflects the individual's

maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996). The responsibility for determining a claimant's RFC is with the ALJ. *see Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). The ALJ is not required to incorporate limitations in the RFC that he did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991). Here, the ALJ carefully considered all of the medical evidence in formulating an RFC that addressed Hernandez's physical and mental impairments. The ALJ's RFC determination  is consistent with Dr. Kirkwood's and Dr. Senior's consultative examinations, the Psychiatric Review Technique Form and Mental Residual Functional Capacity Assessment completed by disability determination unit physician Matthew Wong, Ph.D., the treatment records of Hernandez's treating physicians, Dr. Willits and Dr. Young, and the record as a whole.  The ALJ, based on the totality of the evidence, concluded that Hernandez could perform sedentary work restricted to the extent that she must alternate between sitting and standing at will; can understand, remember, and carry out simple instructions; make simple decisions; attend and concentrate for extended periods; interact with coworkers and supervisors; respond to changes in a routine work setting; and can have occasional public contact, and gave specific reasons in support of this determination. This factor weighs in favor of the ALJ's decision.

### B.  Diagnosis and Expert Opinion

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact.  The law if clear that "a treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with . . . other substantial evidence." *Newton*, 209 F.3d at 455.  The ALJ may give little

or no weight to a treating source's opinion, however, if good cause is shown. *Id*. at 455-56. The Fifth Circuit in *Newton* described good cause as where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or in otherwise unsupported by the evidence. *Id*. at 456. "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. The six factors that must be considered by the ALJ before giving less than controlling weight to the opinion of a treating source are: (1) the length of treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) the support of the source's opinion afforded by the medical evidence of record; (5) the consistency of the opinion with the record as a whole; and (6) the specialization of the source. 20 C.F.R. § 404.1527(d)(2); *Newton*, 209 F.3d at 456. An ALJ does not have to consider the six factors "where there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," and were the ALJ weighs the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id*. at 458; *Alejandro v. Barnhart*, 291 F.Supp.2d 497, 507-11 (S.D.Tex. 2003). Further, regardless of the opinions and diagnoses of medical sources, "the ALJ has sole responsibility for determining a claimant's disability status." *Martinez*, 64 F.3d at 176. "The ALJ's decision must stand or fall with the reasons set forth in the ALL's decision, as adopted by the Appeals Council." *Id.* at 455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established that we may only affirm the Commissioner's decision on the grounds which he stated for doing so."). However, perfection in administrative proceedings is not required. *See Mays*

*v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here, the thoroughness of the ALJ's decision shows that he carefully considered the medical records and testimony, and that his determination reflects those findings accurately. The ALJ summarized the evidence and set forth specific reasons concerning the weight given to the opinions of the medical sources.

Hernandez contends that the ALJ erred by discounting the opinions of her treating physicians, Drs. Willits and Young regarding her physical and mental limitations and as a result, the RFC determination is not supported by substantial evidence. Hernandez maintains that the opinions of both treating physicians are consistent with the record and should not have been discounted. According to Hernandez, Dr. Willits's two opinions about her physical limitations, are consistent with the MRI testing of the cervical spine and lumbar spine that was taken May 2, 2011, showing multilevel degenerative changes corroborate Dr. Willits's opinion. She further points to nerve conduction and electromyography testing that showed neuropathy, and limits in her cervical range of motion noted by Dr. Kirkwood. In addition, Hernandez argues that her testimony corroborated Dr. Willits's opinion. She points to her testimony that she has constant, unremitting pain, and has four to five bad days a week. Similarly, Hernandez argues that the ALJ erred by not according greater weight to the mental opinion limitations from her treating physician Dr. Young, and by Dr. Willits. Hernandez argues that Dr. Young's opinion about her mental limitations are consistent with diagnosis and earlier hospitalization for psychosis. The Commissioner responds that ALJ properly weighed the medical opinions and performed an analysis of the opinion evidence. According to the Commissioner, the ALJ summarized the medical evidence and explained the weight accorded to the opinions of the medical sources.

With respect to the opinions and diagnoses of treating physicians and medical sources, the

ALJ wrote:

>   As for the opinion evidence, as assessment of the claimant's Physical Residual
>   Functional Capacity (RFC) was completed in May 2012 by James Wright, M.D.
>   Based on an evaluation of the medical evidence claimant was found capable to
>   perform work at the light level of physical exertion with postural limitations (Exhibit
>   12F).  In August 2012, Robin Rosenstock, M.D., completed a Physical RFC and
>   determined the claimant could work at the light level of physical exertion with no
>   non-exertional limitations (Exhibit 13F).  Pursuant to SSR 96-6p, the undersigned
>   acknowledges that findings of fact made by state agency medical professionals
>   regarding the nature and severity of an individual's impairments must be treated as
>   expert opinion evidence by a non-examining source.  In the case at hand, the State
>   agency consultants' assessments are given little weight because other medical
>   opinions are more consistent with the record as a whole (Exhibits 1F-3F, 5F-7F, 9F,
>   16F, 18F-21F).
>
>   In May 2012, Matthew Wong, Ph.D., completed a Psychiatric Review Technique
>   Form (PRTF) (Exhibit 10F) and Mental Residual Functional Capacity Assessment
>   (RFC) (Exhibit 11F) regarding the claimant.  Dr. Wong concluded the claimant can
>   understand, remember and carry out only simple instructions, make simple decisions,
>   attend and concentrate for extended periods, interact with coworkers and respond to
>   changes in the routine work setting (Exhibit 11F/3).  Pursuant [to] SSR 96-6p, the
>   undersigned affords this opinion great weight in assessing the residual evidence of
>   record and therefore persuasive.
>
>   In March 2012, Dr. Kirkwood determined the claimant could sit, stand, move about,
>   lift, carry, and handle objects (Exhibit 4F/4).   Great weight is given to Dr.
>   Kirkwood's assessment because his opinion is consistent with the medical evidence
>   of record.
>
>   In February 2013, the claimant's treating physician, Dr. Paul Young, completed a
>   Mental Capacity Assessment and concluded the claimant had marked and extreme
>   limitations in sustained concentration and persistence, social interaction, and
>   adaptation (Exhibit 18F/2-4).  In February 2012 and June 2013, another treating
>   physician, Dr. Leroy Willits, completed a Residual Functional Capacity
>   Questionnaire and determined the claimant could not work at even the sedentary
>   level of physical exertion (Exhibits 3F/2-3; 19F/2-3).  Dr. Willits also answered a
>   Mental Capacity Assessment and determined the claimant had marked and extreme
>   limitations in sustained concentration and persistence (Exhibit 20F/2-4).  Pursuant
>   to SSR 96-2p and SSR 06-03p, the undersigned considered the opinions and affords
>   them little weight because the opinions are not consistent with the treating records,
>   other records in the file as described above, and are not consistent with what the
>   claimant stated she is able to do.  Additionally, Dr. Willits is not a psychiatric doctor.
>
>   In sum, the above residual functional capacity assessment is supported by the

longitudinal medical records, the opinions of the State agency medical consultants, and the claimant's activities of daily living.  While the claimant's impairments are severe in that they have more than a minimal effect on her ability to function, they are not totally disabling and do not preclude the performance of all substantial gainful activity.  (Tr. 28-29).

Here, the ALJ explained his rationale for discounting the limitations, physical and mental. The ALJ agreed with both Dr. Willits and Dr. Young that Hernandez was somewhat limited in physical and mental abilities.  Based on the totality of the record, the ALJ found that she was limited to the extent that she must alternate between sitting and standing at will.  Mentally, he found she was limited to the extent that she can understand, remember, and carry out simple instructions, make simple decisions; attend and concentrate for extended periods, interact with coworkers and supervisors; respond to changes in a routing work setting; and can have occasional public contact. The ALJ's decision shows that he gave specific reasons for not giving greater weight to the opinions of Dr. Willits and Dr. Young in their respective RFC evaluations, and instead relied on opinions of the two consulting physicians, an opinion of a state agency reviewing physician, diagnostic testing results, and treatment records.  Furthermore, the ALJ cited to the applicable regulations and demonstrated that the relevant factor had been considered.  (Tr. 26).  Treatment records from Dr. Willits show few objective findings and clinical impressions supporting the limitations in the RFC. (Tr. 237, 240, 241, 242).  Instead, the progress notes are replete with symptoms reported by Hernandez or the status of her disability application.  The impairment ratings on the forms completed by Dr. Willits and Dr. Young were far more limiting than their respective treatment notes would suggest.  Overall, the longitudinal treatment records do not support the assessments.  Upon this record, the ALJ did not err is not giving the opinions of Dr. Willits and Dr. Young controlling weight.  The ALJ's decision is a fair summary and characterization of the medical records. Given the proper discounting of the opinions of Drs. Willits and Young concerning Hernandez's physical

and mental limitations, and the medical opinions which do support the ALJ's residual functional capacity determination, upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### C.  Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends.  Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render him disabled.  *Cook,* 750 F.2d at 395.  The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423.  The statute provides that allegations of pain do not constitute conclusive evidence of disability.  There must be objective medical evidence showing the existence of a physical or mental impairment which could reasonably be expected to cause pain.  Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record.  42 U.S.C. § 423.  "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)).  Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform.  *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994).  The Act requires this Court's findings to be deferential.  The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALL, who has had the opportunity to observe the claimant.  *Hames,* 707 F.2d at 166.

Here, Hernandez testified about her health and its impact on her daily activities.  She offered no testimony or corroboration from her family or friends with respect to her complaints about her condition.  Hernandez testified that neck surgery had been recommended in 2011 but she did not

have the surgery because she could not afford it.  (Tr. 59-60).  Instead, she had cervical injections. (Tr. 60).  Hernandez stated that the injections left her with a nasty taste in the mouth and weight gain, so she discontinued the injections.  (Tr. 60).  For pain control, Hernandez testified that she wears patches that ease the pain intensity to a level of 6 out of 10.  (Tr. 60-61).  Hernandez stated that the pain is constant and unremitting.  (Tr. 66).  Hernandez testified that while it is painful, she is able to bend over.  (Tr. 61).  According to Hernandez, the pain radiates down her arms and legs.  (Tr. 62). She has difficulty gripping and once dropped a coffee pot.  (Tr. 62).  Hernandez estimated she could lift 10 to 15 pounds, walk about 15 minutes and stand an hour or two.  (Tr. 62-63).  She testified that she could sit thirty minutes to an hour.  (Tr. 64).  Hernandez added that when she has a bad day, she spends the day sitting down. Hernandez estimated that she has bad days four or five days a week. (Tr. 63).  With respect to her daily activities, Hernandez testified that she does chores around the house but takes breaks "all day long.  I have to do it at my own pace in other words."  (Tr. 63, 66). As for her mental health, Hernandez described herself as being "stressed out a lot, you know, because of the money situation.  I have no money, income coming in.  And everybody is frustrated with me because I can't carry my own weight in other words."  (Tr. 64).  She stated she has no side effects from medications.  (Tr. 66).   Based  on the reasons which follow, the ALJ rejected Hernandez's testimony as not fully credible:

> As a result of her impairments, the claimant alleges that she has back and neck pain, the pain radiates to her extremities, she has difficulty bending, gripping, and sleeping, crying spells, and can lift 10-15 pounds, walk 15 minutes, sit 30 minutes, and stand 1-2 hours (Hearing Testimony).  She also reported her impairments affect squatting, reaching, kneeling, stair climbing, concentration, understanding, and using hands (Exhibit 4E/6).

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the

reasons explained in this decision.

The claimant reported she has back and neck pain from a motor vehicle accident more than 15 years ago (Exhibit 4F/1). She reported she was riding her bike "a lot" in March 2011, and her blood pressure was 159/116 (Exhibit 2F/4).

MRIs of the cervical and lumbar spine in May 2011 showed multilevel degenerative changes with moderate canal stenosis (Exhibit 1F/3-6). In June 2011, she had pain and restricted range of motion of her neck, and no spinal tenderness, with negative straight leg raising (Exhibit 1F/1). A cervical disc fusion was recommended; however, the claimant repeatedly refused surgery (Exhibits 1F/2; 2F/7-8).

EMG/Nerve Conduction Study in January 2012 suggested mild to moderate right median sensory-motor neuropathy, mild left median sensory neuropathy, and clinical correlation with MRI was recommended (Exhibit 16F/9). However, no correlating MRI in the record.

On March 13, 2012, the claimant had a physical consultative examination (CE) with Mr. Milton Kirkwood. Her blood pressure was 130/66, she was fully oriented, and her gait and station were normal (Exhibit 4F/2). She had a normal cardiovascular exam and she had good range of motion of the cervical and lower spine, with some decreased flexion of the lower spine (Exhibit 4F/3). Grip strength and muscle tone were normal, with good extension of the lower legs against gravity, and no significant atrophy (Exhibit 4F/3). Based on his examination and records, Dr. Kirkwood determined the claimant could sit, stand, move about, lift, carry, and handle objects (Exhibit 4F/4). There was no evidence of back spasms, loss of motion, or atrophy in all extremities (Exhibit 4F/4). Strength was normal in all extremities, her gait was normal, she could tandem walk, ambulated without an assistive device, and there were no significant varicosities or recurrent ulcerations (Exhibit 4F/4).

On March 16, 2012, the claimant was involuntarily taken to the Psychiatric Center for an evaluation because she was hitting her husband, punching a glass door, and breaking property (Exhibit 5F/1). The claimant stated her husband was having a cocaine party and he was going to kill her (Exhibit 5F/1). She had a normal physical exam, and no previous mental health diagnosis (Exhibit 5F/4, 9). Medication was started with effective response, and the claimant was discharged five days later (Exhibit 5F/7, 11).

The claimant had cervical facet injections in February and April 2012 (Exhibit 6F/3, 13). She had marked relief for 48 hours and her cervical radiculopathy was resolved (Exhibit 7F/17).

In May 2012, the claimant had a mental CE with Dr. Kathleen Senior. On her mental status examination, the claimant was cooperative, rapport was established, there were

no special preoccupations, mentation was of coherent form, normal content, and normal pace, she was fully oriented, remote memory was intact, concentration was fair, insight was adequate, judgment was average, concentration and persistence were fair, and pace was normal (Exhibit 8F/2-4). Dr. Senior assessed the claimant's GAF at 60, demonstrating moderate symptoms or moderate difficulty in social, occupational, or school functioning (Exhibit 8F/4).

The claimant did not seek treatment for neck or back pain from May 2012 through September 2012 (Exhibit 16F/2). In September 2012, the claimant did not want any more injections or back surgery, and was given one month of pain medication (Exhibit 16F/2).

In April 2013, the claimant did not have signs or symptoms of her mental impairments, her physical exam was normal, and psychiatric exam was within normal limits (Exhibit 21F/3). The claimant was instructed to return in three months. (Exhibit 21F/3).

The medical evidence indicates the claimant has a BMI ranging from 31.4 to 32.8. Although the claimant was repeatedly advised to diet, her BMI continues to classify her as obese (Exhibits 5F/12). The undersigned considered the effects of claimant's obesity on coexisting or related impairments.

The claimant was assessed GAF scores of 32-44 (Exhibit 5F/11). GAF scores, while certainly evidence to be considered, do not directly correlate to a determination of whether an individual is or is not disabled under the Social Security Act. The GAF scale has no direct correlation to the severity requirements in the mental health listing (65 Fed. Reg. 50746, 50764-65). Little or no weight is given to these scores because they are not consistent with other substantial evidence. Treatment records consistently indicate improvement in the claimant's condition when she is compliant with medication therapy.

Additionally, the claimant is able to prepare meals, do dishes and laundry, shop, maintain her personal hygiene and grooming, clean, mow, ride a bicycle, drive, watch television, and garden (Exhibit 4E; Hearing Testimony). She visits with friends, spends time with others, can go out alone, attends church monthly, and does not have a problem getting along with family, friends, neighbors, and authority figures (Exhibits 4E; 8F/4). The claimant can pay bills and manage her finances, finish what she starts, handle changes in routine, and follow written and spoken instructions. The fact that claimant can engage in the foregoing activities indicates that she is not totally precluded from all work related activities. Therefore, the evidence as a whole does not indicate that claimant's impairments, considered separately or in combination, warrant a finding of total disability as she alleged. (Tr. 27-28).

The undersigned finds that there is nothing in the record to suggest that the ALJ made improper

credibility findings, or that he weighed the testimony improperly.  While Hernandez argues that the ALJ erred by failing to consider the significant side effects of her prescribed medications, she testified that she had none. As for Hernandez's argument that she cannot afford surgery and the ALJ improperly discounted her credibility because she did not have surgery, the law is clear that an ALJ cannot draw inferences from a claimant's failure to seek medical treatment without considering the claimant's explanations, such as an inability to afford treatment.  SSR 96-7p, 1996 WL 374186, at *7-8 (1996).  Here, the medical evidence shows that Hernandez declined to seek surgery based on cost.  The totality of the ALJ's decision indicates that even if he erred by characterizing the decision as a refusal (Tr. 27), that misstatement alone was not the only basis for not finding her complaints not fully credible. Accordingly, this factor also supports the ALJ's decision.

### D.  Education, Work History, and Age

The final element to be weighed is the claimant's educational background, work history and present age.  A claimant will be determined to be under disability only if the claimant's physical or mental impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Laurie McQuade, a vocational expert ("VE"), at the hearing.  "A vocational expert is called to testify because of his familiarity with job requirements and working conditions.  'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)).  It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d

431, 436 (5th Cir. 1994).  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record.  Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)."  *Bowling,* 36 F.3d at  436.

The ALJ posed the following hypothetical questions to the VE:

Q.  Based on her age, education, and past work experience, assume I find she has to alternate between the sitting and standing at will; lift up to 10 pounds, sedentary level.  She can understand, remember, and carry out simple instructions; make simple decisions; attend and concentrate for extended periods. I think she can actually interact with coworkers and supervisors; and respond to changes in a routine work setting.  However, the last hospitalization she had, I would put her on limited public contact.  She has a temper apparently that comes out occasionally.  She had a hospitalization in March of '12, I believe on that.  So could she do her past relevant work?
A.  No.

Q.  Do her skills transfer from the home health care?

A.  No, it's only at the entry level of semi-skilled and so would not have any transferability, sir.  (Tr. 72)

Hernandez's counsel questioned the VE:

Q.  She has mentioned that she needs several breaks throughout the day as she moves about per day.  If an individual would need four to five unscheduled breaks lasting 10 to 15 minutes, could that person sustain full time employment?

A.  No.  (Tr. 73).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert.  A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Hernandez argues that the RFC determination is not supported by substantial evidence because it did not incorporate the limitations of her two treating physicians, and that had those limitations been included that it is likely the Vocational Expert would

have testified that no work exists for such a person in the national economy with these limitations.

Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion

that Hernandez was not disabled.  Based on the testimony of the vocational expert and the medical

records, substantial evidence supports the ALJ's finding that Hernandez could perform  work as a

surveillance system monitor, a ticket counter, and a check cashier.  The Court concludes that the

ALJ's reliance on the vocational testimony was proper, and that the vocational expert's testimony,

along with the medical evidence, constitutes substantial evidence to support the ALJ's conclusion

that Hernandez was not disabled within the meaning of the Act and therefore was not entitled to

benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the

evidence presented.  Accordingly, this factor also weighs in favor of the ALJ's decision.

## V.  Conclusion

Considering the record as a whole, the Court is of the opinion that the ALJ and the

Commissioner properly used the guidelines propounded by the Social Security Administration,

which direct a finding that Hernandez was not disabled within the meaning of the Act, that

substantial evidence supports the ALL's decision, and that the Commissioner's decision should be

affirmed.  As such, it is

ORDERED Plaintiff's Motion for Summary Judgment (Document No. 12), is  DENIED,

Defendant's Motion for Summary Judgment (Document No. 14) is GRANTED, and the decision of

the Commissioner of Social Security is AFFIRMED.

Signed at Houston, Texas, this 11th  day of February, 2016

Frances H. Stacy
United States Magistrate Judge